NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SHOSHAWNA S., *Appellant*,

v.

DEPARTMENT OF CHILD SAFETY, K.S., *Appellees*.

No. 1 CA-JV 18-0419
FILED 5-23-2019

Appeal from the Superior Court in Maricopa County
No. JD529388
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Laura J. Huff
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate
By Robert M. Miller
*Counsel for Appellee K.S.*

---

## MEMORANDUM DECISION

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**W E I N Z W E I G**, Judge:

¶1          Shoshawna S. ("Mother") appeals the superior court's order terminating her parental rights to K.S., arguing that termination was not in the child's best interest. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2          Mother and Benjamin Turner ("Father") are the biological parents of K.S., born November 2008.[1]  The Department of Child Safety ("DCS") first learned about Mother and K.S. in March 2014, when Mother took K.S. to the emergency room because she believed that K.S. had been exposed to drugs and that methamphetamine was leaking from her apartment ceiling.  Mother's behavior was reportedly strange and paranoid. DCS encountered Mother again in February 2015 after police had responded several times to reports of domestic violence, including an incident where "glass was heard breaking during a time that yelling was also heard."  K.S. was seen walking outside in the cold and wearing only diapers.  DCS found the reports "unsubstantiated."

¶3          DCS received a third report in October 2015.  Police had twice responded to domestic violence calls where Mother and K.S. lived.  The home was described as unlivable; it looked "like it should be on that hoarders TV show" because of all the "stuff piled to the ceiling with a small walk way."  The bathrooms were unusable, the refrigerator was inaccessible and there was no sleeping space. Indeed, Mother and K.S. slept in a car. DCS officials also expressed concern about Mother's mental health.  "[M]other is schizophrenic and is not on any medication.  It is believed that her condition affects her ability to parent.  The mother is sporadic in her thinking."  DCS temporarily removed K.S. from Mother's care.

¶4          Within a week of removal, however, DCS returned K.S. to Mother.  DCS also referred Mother for services, including psychological

---

[1]     Father is not part of this appeal.

and psychiatric evaluations, supervised visits, parent aide, therapeutic family visits and a support partner to help Mother with housing and services.

¶5 DCS again removed K.S. from Mother in March 2016 based on Mother's "bizarre behaviors," poor cognitive functioning and mismanagement of emotions. Mother, for instance, had reported hearing voices telling her to do "bad things." In June 2016, the court found K.S. dependent as to Mother based on neglect and mental illness.

¶6 Around the time of the second removal, a clinical psychologist examined Mother and "felt that the prognosis for Mother's ability to parent was poor," rendering a provisional diagnosis of "Schizoaffective Disorder, Bipolar type, as well as Borderline Intellectual Functioning."

¶7 After the evaluation, Mother began mental health treatment, including prescription medication, individual counseling and two more mental health evaluations. She missed about half of her individual counseling sessions and refused to take her medications as prescribed. And doctors concluded that Mother's mental health disorders would continue for a long, unknown period. Her ability to parent adequately in the future was described as "[f]air to poor," at most. She never maintained stable housing and employment or "demonstrate[d] appropriate parenting skills," despite all the services DCS offered. As DCS reports explained, Mother "remained unable to manage her mental health sufficiently to safely and appropriately parent."

¶8 The superior court changed Mother's case plan to severance and adoption in January 2018, and DCS moved to terminate Mother's parental rights to K.S. the next month. The court held a four-day severance hearing in July 2018, where several exhibits were admitted and six witnesses testified, including Mother and her counselor, two clinical psychologists, the parent aide and the case manager.

¶9 The superior court released its decision in October 2018, finding DCS had proven the statutory grounds of mental illness and fifteen months' out-of-home placement. A.R.S. § 8-533(B)(3), (8)(c). The court also found termination was in K.S.'s best interests. Mother timely appealed.

## DISCUSSION

¶10 To terminate parental rights, the superior court must find clear and convincing evidence of at least one statutory ground in A.R.S. § 8-

533(B), and that termination is in the child's best interests by a preponderance of the evidence. *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 213, ¶ 5 (App. 2016). We will affirm a severance order unless it is clearly erroneous and will accept the court's factual findings unless no reasonable evidence supports them. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

**¶11** Mother does not challenge the two statutory grounds for severance, but instead argues that termination of her parental rights was not in K.S.'s best interest. The best-interests prong requires the court to determine whether "the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50, ¶ 19 (App. 2004) (quotation omitted).

**¶12** The record supports the superior court's finding that severance was in K.S.'s best interests. To begin, the court found clear and convincing evidence of two statutory grounds for termination, including mental illness and time in out-of-home placement. We have recognized that "[i]n most cases, the presence of a statutory ground will have a negative effect on the children." *Maricopa Cty. Juv. Action No. JS-6831*, 155 Ariz. 556, 559 (App. 1988). By the same token, the DCS case manager testified that severing Mother's parental rights was in K.S.'s best interests because Mother was "unable to safely care for [K.S.] or meet his basic needs." The court also found K.S. would be harmed if forced to continue the relationship because "Mother ha[d] not sufficiently addressed and resolved her mental health issues, which have only worsened."

**¶13** The record also reflects that K.S. would benefit from severance. The case manager testified that severance would free K.S. for adoption, which would provide him permanency, stability and a safe caregiver, and that K.S. is "adoptable" because he is likeable, smart and manageable. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 10 (App. 2016) (severance beneficial when it makes child "eligible for adoption" and when child is "adoptable"). The court also found his "[c]urrent placement is providing stability and is meeting all of the child's needs." *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013) (best-interests analysis considers "whether the current placement is meeting the child's needs").

**¶14** Mother makes three arguments. She first argues K.S. was not adoptable at the time of the severance hearing because he was not in an adoptive placement and had been removed from his last placement for alleged "sexualized behaviors," which would diminish his adoption

possibilities. But the best-interests prong does not require an immediate adoption for an "adoptable" child, *Mary Lou C.*, 207 Ariz. at 50, ¶ 19, and the DCS case manager testified that K.S. remained adoptable. The case manager referred to her experience in rebutting Mother's argument that K.S. was unlikely to find an adoptive family.

**¶15** Mother next argues the superior court did not specifically list a detriment to K.S. if the relationship continues and the record includes no such evidence. We disagree. The court referred to Mother's worsening mental health issues, which made her unable to carry out her parental responsibilities.

**¶16** Finally, Mother points to evidence she deems as more favorable to her position, but we do not reweigh the evidence on appeal and the record contains reasonable evidence to support the superior court's decision. *See Joelle M. v. Dep't of Child Safety*, 245 Ariz. 525, 528, ¶ 18 (App. 2018).

## CONCLUSION

**¶17** We affirm.

